# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of:<br><br>MICHAEL KARL KUEHNER,<br><br>     Appellant,<br><br> v.<br><br>BRENDA WALLACE KUEHNER,<br><br>     Respondent. | No. 57203-6-II<br><br><br><br>UNPUBLISHED OPINION |

VELJACIC, J. — Michael Kuehner and Brenda Wallace Kuehner (hereinafter Michael and Brenda) filed for divorce in 2018. The parties negotiated a settlement agreement under Civil Rule (CR) 2A in July 2020. Two years later, Michael filed a motion to reduce his monthly spousal maintenance obligation under the settlement agreement, which Brenda responded to by counter motion. In July 2022, the trial court issued an order in Brenda's favor. Michael then filed a motion to vacate the July 2022 order under CR 60(b)(4), claiming it was obtained through fraud. He appeals the trial court's denial of this motion.

We hold that the trial court did not abuse its discretion by denying Michael's motion to vacate, and that the trial court properly interpreted the settlement agreement. We affirm the trial court's orders. We also award Brenda attorney fees.

FACTS

Michael and Brenda were married in 1987. They ceased living together in 2015, and Michael filed for divorce in 2018. Eventually, the parties negotiated, and on July 20, 2020, executed a CR 2A settlement agreement.[1] The relevant portion of the settlement agreement reads:

> 1. Michael Kuehner shall pay Brenda Kuehner spousal maintenance of $6,000 per month beginning August 2020 until the full $360,000 is paid per paragraph 2, below. Payments shall be due on the 15th of each month.
> 2. Michael Kuehner shall pay Brenda Kuehner $360,000 within the next three (3) years, beginning August 2020.
> 3. Each time Brenda Kuehner receives $120,000, Michael Kuehner's spousal maintenance obligation shall be reduced by $2,000 per month. Once Michael Kuehner has paid Brenda Kuehner $360,000, his spousal maintenance obligation shall be terminated.
> 4. Michael Kuehner's $120,000 payments shall be made directly to Brenda Kuehner or an LLC established by Brenda Kuehner at her sole discretion.
> 5. So long as Michael Kuehner owes spousal maintenance to Brenda Kuehner, he shall maintain and or designate Brenda Kuehner as the beneficiary of his life insurance policy with New York Life, up to $360,000 or amount owed per this Agreement, including unpaid maintenance.

Clerk's Papers (CP) at 14.

On March 12, 2021, after several hearings, the trial court ruled that all obligations had been performed and that the settlement agreement was enforceable. On September 21, Superior Court Commissioner Gelman held a hearing focusing on one aspect of the CR 2A agreement: maintenance of an insurance policy. The hearing resulted in an order (hereinafter "Gelman Order") that read:

> It is also ordered that Michael Kuehner must maintain New York Life policies listing Brenda Wallace Kuehner as the beneficiary with beneficiary benefits of at least $360,000 payable to Brenda Wallace Kuehner. These policies must remain current and enforceable until the full amount of the $360,000 dollar equalization payment bas been paid in full.

---

[1] A trial court order regarding the settlement agreement has already been before this court. That opinion addresses attorney fees and is unrelated to matters in this appeal. *In re Marriage of Kuehner*, No. 55323-6-II (Wash. Ct. App. Mar. 1, 2022) (unpublished), http://www.courts.wa.gov/opinions/.

CP at 235.

> However, that language was edited in pen by the commissioner to read:

> It is also ordered that Michael Kuehner must maintain New York Life policies listing Brenda Wallace Kuehner as the beneficiary with beneficiary benefits *up to* $360,000 payable to Brenda Wallace Kuehner. These policies must remain current and enforceable until the *amount of spousal maintenance owed to a maximum of $360,000 pursuant to the CR2A agreement has been paid in full*.

CP at 25 (emphasis indicates the changes).

In June 2022, Michael filed a motion seeking to reduce his $6,000 monthly maintenance[2] obligation to $4,000. But Michael did not confirm his motion to reduce the maintenance payments, so it was stricken and not heard.

Brenda filed a counter motion, seeking an order clarifying and enforcing the terms of the settlement agreement as imposing separate obligations for a $360,000 community property equalization payment *and* for monthly spousal maintenance. She argued that the agreement was not that she would receive $360,000 for spousal maintenance. Rather, her position was that she would continue to receive monthly spousal maintenance until Michael had paid the community property equalization obligation of $360,000, and that the amounts agreed to in the disputed paragraphs were separate awards. Michael did not file a response to Brenda's counter motion.

In July 2022, the trial court heard Brenda's counter motion and adopted Brenda's interpretation of the settlement agreement. The court ordered that: (1) the spousal maintenance and the community property equalization obligation in the settlement agreement were separate obligations; (2) the $360,000 was "a cash obligation from [Michael] to [Brenda] as payment for her interest in the parties' community property and to be paid within three years of the date of the

---

[2] "Spousal maintenance" or "maintenance" is sometimes referred to as "spousal support" by the trial court and the parties.

agreement," CP at 36; and (3) the current maintenance amount was $6,000 per month. The court further clarified:

> The maintenance award is separate and distinct from the property award of $360,000. Per the language of the CR2A agreement, the spousal maintenance is tied to the property award because spousal maintenance terminates upon full payment of the $360,000, and the monthly maintenance obligation is reduced under the agreement when certain benchmarks are met regarding payment of the $360,000 property award as follows:
>
> Once Petitioner has paid $120,000 towards the property obligation, the monthly spousal support payment would be reduced by $2,000, to $4,000 per month. Once an additional $120,000 was paid toward the property obligation, support would be reduced by $2000, to $2000 per month. Spousal maintenance terminates when the $360,000 is paid in its entirety.

CP at 36.

Subsequently, Michael filed a notice of appeal of the order on the counter motion and brought a motion to vacate the July 2022 order under CR 60(b)(3) and (4), claiming it was obtained through fraud. Essentially, he asserted that Brenda had fraudulently misrepresented her intent to the trial court because the parties had previously mutually intended $360,000 to be the maximum total amount of all payments.

In support of his motion to vacate, Michael filed with the court a disclosure of possible witnesses and exhibits and the declaration of his former attorney, Barbara Henderson, concerning the settlement agreement. CP 50. The Henderson declaration was never offered into evidence, and Henderson did not appear for testimony. In support of his position, Michael also filed documents prepared by David Syme, Michael's attorney, but these were voluntarily withdrawn. The declaration was described by Syme as "just an attempt to explain the math." Rep. of Proc. (RP) (Sept. 30, 2022) at 27.

After hearing Michael's CR 60 motion on September 30, 2022, the trial court denied it. The court said: "Given that we are where we are and I'm now aware of Commissioner Gelman's

4

ruling that I do believe becomes binding, I'm going to deny the motion to set aside my ruling of July 22nd and I'm not going to move forward on the evidentiary hearing today." RP ( Sept. 30, 2022) at 51-52.

The court entered a written ruling on October 10, 2022. The court ruled that Michael still owed the full $360,000 of his community property equalization obligation; the $144,000 already paid were simply maintenance payments and could not be used to reduce the $360,000 community property equalization obligation; the $6,000 per month maintenance payments did not count to reduce the $360,000 of outstanding community property equalization obligation; payment of the $360,000 community property equalization owed would extinguish any further maintenance payments.

Michael appeals the October 2022 written ruling.

ANALYSIS

I. DENIAL OF CR 60(b) MOTION TO VACATE

A. Standard of Review

The decision to grant or deny a motion to vacate a judgment or order under CR 60(b) is within the trial court's discretion. *Jones v. City of Seattle*, 179 Wn.2d 322, 360, 314 P.3d 380 (2013). Therefore, we review CR 60(b) orders for abuse of discretion. *Union Bank, NA v. Vanderhoek Assocs., LLC*, 191 Wn. App. 836, 842, 365 P.3d 223 (2015); *Lindgren v. Lindgren*, 58 Wn. App. 588, 595, 794 P.2d 526 (1990).

A trial court abuses its discretion when its decision is based on untenable grounds or is made for untenable reasons, or that the discretionary act was manifestly unreasonable. *Union Bank*, 191 Wn. App at 842; *Lindgren*, 58 Wn. App. at 595. The discretionary judgment of a trial court of whether to vacate a judgment or order is a decision upon which reasonable minds can

sometimes differ. *Lindgren*, 58 Wn. App. at 595. When a party appeals a trial court's ruling on a CR 60(b) motion, our review is limited to the decision to deny the motion, not the underlying order that the party sought to vacate. *Bjurstrom v. Campbell*, 27 Wn. App. 449, 450-51, 618 P.2d 533 (1980).

      B.     CR 60(b)(4)

CR 60(b) provides that the trial court may relieve a party from a final judgment, order, or proceeding for one of the rule's stated reasons. "Finality of judgments is a central value in the legal system, but circumstances can arise where finality must give way to the greater value that justice be done." *Shandola v. Henry*, 198 Wn. App. 889, 895, 396 P.3d 395 (2017). CR 60(b) provides a balance "'between finality and fairness'" by listing limited circumstances under which a judgment may be vacated. *Union Bank*, 191 Wn. App. at 846 (quoting *Suburban Janitorial Servs. v. Clarke Am.*, 72 Wn. App. 302, 313, 863 P.2d 1377 (1993)).

Michael submitted his motion based on CR 60(b)(4).[3] That provision states:

> On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order, or proceeding for the following reasons:
>     . . . .
>     (4) Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

*Id*.

Subparagraph (4) of CR 60(b) authorizes a trial court to vacate a judgment for fraud, misrepresentation, or other misconduct of an adverse party. *Lindgren*, 58 Wn. App. at 596. "The rule does not, however, permit a party to assert an underlying cause of action for fraud that does not relate to the procurement of the judgment." *Id*. The fraudulent conduct or misrepresentation

---

[3] Michael also submitted his motion pursuant to CR 60(b)(3), but neither party address this aspect of the motion on appeal. Accordingly, we do not address it.

must *cause* the entry of the judgment such that the losing party was prevented from fully and fairly presenting its case or defense. *Peoples State Bank v. Hickey*, 55 Wn. App. 367, 372, 777 P.2d 1056 (1989).

The party attacking a judgment under CR 60(b)(4) must establish the fraud, misrepresentation, or other misconduct by clear and convincing evidence. *Id*. Clear and convincing evidence is that which shows the ultimate fact in issue to be "highly probable," and not merely more likely than not. *Winter v. Dep't of Soc. & Health Servs.*, 12 Wn. App. 2d 815, 830, 460 P.3d 667 (2020).

C.      The Trial Court Did Not Abuse Its Discretion in Denying the Motion to Vacate

Michael appeals the order denying his motion to vacate the July 2022 order based on alleged fraud in procuring the July 2022 order. Accordingly, Michael must show that the trial court abused its discretion when it denied the motion to vacate the July 2022 order and in finding that Michael had failed to prove any fraud or misrepresentation to justify vacating the order or reopening the issue of its interpretation of the settlement agreement. Michael fails in this endeavor, and we affirm the trial court's denial of the CR 60(b)(4) motion.

Michael's argument centers on the trial court's interpretation of the settlement agreement where it ruled: (a) $360,000 in community property equalization obligation is still owed to Brenda; (b) the maintenance payments paid are not credited against the $360,000 amount; and (c) Michael must pay monthly maintenance until he makes a lump sum payment retiring his community property equalization obligation. Michael's arguments on appeal regarding the settlement agreement simply do not address the trial court's conclusion that there was no fraud. The basis of Michael's motion before the trial court was that fraud in the procurement of the July 2022 order justified vacating that order, but he failed to make a showing of fraud before the trial court and

7

fails to address fraud here. He presents no authority for any of his assertions. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

Michael argues that after the hearing on September 30, 2022, he believes that: the court was given the wrong Gelman Order, one that had been "hastily discovered" and "that Brenda [] wished had been signed." Br. of Appellant at 19. However, Michael's position is nothing more than his belief; he presented no evidence that it was "highly probable" that the order had been obtained through fraud. *See Winter*, 12 Wn. App. 2d at 830. Neither Michael's briefing, nor the documents he submitted, offer any support for his belief. Likewise, nothing in the hearing transcript suggests that Brenda's counsel presented a copy of the Gelman Order to the trial court in the hearing that led to the July 2022 order. Michael's belief as to why the court ruled the way it did is outside the record. Michael's argument fails to show an abuse of discretion.

The evidence Michael relies on to support the existence of fraud was not properly before the trial court and is not properly before us. In his brief, Michael suggests that his former attorney, Henderson, declared that her intention in drafting the settlement agreement was in line with Michael's interpretation. Michael includes an excerpt of a letter she wrote. Apparently, his purpose in doing so is to suggest that either there has been fraud or that the trial court's interpretation of the settlement agreement was incorrect. However, while Henderson's declaration was listed in Michael's potential witnesses and exhibit list, it was never submitted as evidence. Henderson did not appear for testimony at the hearing. Thus, Henderson's declaration cannot support Michael's fraud claim.

Similarly, the documents prepared by Syme are unhelpful to Michael. While they may have been intended to support his motion, they were never actually before the trial court because Syme expressly withdrew the documents. They were, therefore, not before the trial court and are not before us; we do not consider the Syme documents. Michael has not demonstrated that the trial court abused its discretion in denying his motion to vacate the order due to fraud.

We hold that the trial court's denial of Michael's CR 60(b)(4) motion was not an abuse of discretion.

## II.    INTERPRETING THE SETTLEMENT AGREEMENT[4]

Michael also appeals the July 2022 order adopting Brenda's interpretation of the settlement agreement.[5]   Michael argues that the $360,000 figure should be interpreted as the maximum maintenance that was due to Brenda, and not an additional $360,000 community property equalization payment. Under Brenda's interpretation, the four disputed paragraphs establish two separate and distinct obligations: an obligation under paragraph 2 to make community property equalization payments totaling $360,000, payable in three $120,000 annual payments; and a separate obligation under paragraph 1 to pay maintenance of $6,000 per month, which is reduced

---

[4] As an initial matter, Michael waived the arguments he now makes on appeal. He did not raise any of the claims of error before the trial court that he now raises on appeal. He did not confirm his motion to reduce maintenance, he failed to respond to Brenda's motion to clarify separate maintenance and equalization obligations, and at the hearing before the trial court, Michael never provided an alternative reading of the agreement to Brenda's, despite being asked multiple times by the court. And finally, even if his motion to reduce maintenance had been considered, it did not raise the issues Michael now raises in this appeal. We "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a); *see also State v. Tolias*, 135 Wn.2d 133, 140, 954 P.2d 907 (1998); *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995). The rule provides limited exceptions in which we must review certain types of errors raised for the first time on appeal. *See* RAP 2.5(a). Michael does not argue that any exceptions apply here. Nevertheless, we exercise our discretion to reach the merits of the issue of interpretation of the agreement.

[5] Michael filed a notice of appeal on August 12, 2022.

by $2,000 for every $120,000 paragraph 2 community property equalization payment made, until maintenance is reduced to zero when the paragraph 2 community property equalization obligation is paid in full, which per the agreement, should take no more than three years (one $120,000 payment each year, for three years).

A.      Legal Principles

The interpretation of a property settlement agreement is a question of law that we review de novo. *In re Marriage of Gimlett*, 95 Wn.2d 699, 705, 629 P.2d 450 (1981). We interpret settlement agreements in the same way we interpret other contracts. *McGuire v. Bates*, 169 Wn.2d 185, 188-89, 234 P.3d 205 (2010). In doing so, the goal is to determine the parties' intent by focusing on their objective manifestations as expressed in the agreement. *See Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).

We will impute an intention corresponding to the reasonable meaning of the words used. *Id*. Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if an intention can be imputed that corresponds to the reasonable meaning of the actual words used. *Id.* at 503-04. Words in a contract are generally given their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. *Universal/Land Constr. Co. v. City of Spokane*, 49 Wn. App. 634, 637, 745 P.2d 53 (1987). We do not interpret what was intended to be written but what was written. *J.W. Seavey Hop Corp. of Portland v. Pollock*, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944).

Contracts are also considered as a whole, giving them a fair, reasonable, and sensible construction. *Kut Suen Lui v. Essex Ins. Co.*, 185 Wn.2d 703, 710, 375 P.3d 596 (2016). "Where possible, we harmonizes clauses that seem to conflict in order to give effect to all of the contract's provisions." *Id*.

B.      Brenda's Interpretation Corresponds to the Reasonable Meaning of the Settlement
        Agreement

The contract dispute centers on paragraphs 1-4 of the settlement agreement, repeated here

for ease of reference:

> 1. Michael Kuehner shall pay Brenda Kuehner spousal maintenance of $6,000 per
> month beginning August 2020 until the full $360,000 is paid per paragraph 2,
> below.  Payments shall be due on the 15th of each month.
> 2. Michael Kuehner shall pay Brenda Kuehner $360,000 within the next three (3)
> years, beginning August 2020.
> 3. Each time Brenda Kuehner receives $120,000, Michael Kuehner's spousal
> maintenance obligation shall be reduced by $2,000 per month.  Once Michael
> Kuehner has paid Brenda Kuehner $360,000, his spousal maintenance obligation
> shall be terminated.
> 4. Michael Kuehner's $120,000 payments shall be made directly to Brenda Kuehner
> or an LLC established by Brenda Kuehner at her sole discretion.

CP at 14.

To argue for his position that the $360,000 should be interpreted as the maximum

maintenance that was due to Brenda, and not an additional $360,000 community property

equalization obligation, Michael asks us to consider the text with added words that do not appear

in the settlement agreement.   Specifically, Michael argues that inserting the words "spousal

support" in a number of places where it does not appear demonstrates that his position is correct.

Br. of Appellant 11-12.  But courts interpret what was written, not what a party wishes was written.

*Hearst*, 154 Wn.2d at 504.   Courts will impute an intention corresponding to the reasonable

meaning of the words used and will not look to the subjective intent if it can do so.  *Id*. at 503.

Accordingly, Michael's position, based on the addition of words that do not appear in the

settlement agreement, is unpersuasive.

Brenda's interpretation, which was adopted by the trial court, more reasonably harmonizes

the disputed provisions when read together.  Taken together, these four paragraphs establish two

separate and distinct obligations: an obligation under paragraph 2 to make community property

equalization payments totaling $360,000 over the course of three years; and an obligation under paragraph 1 to pay maintenance of $6,000 per month, which is reduced by $2,000 for every $120,000 payment toward the paragraph 2 community property equalization obligation.

Michael also suggests that the trial court's interpretation yields absurd results. Michael reasons that "there were no Community Property assets to support a finding that [he] should pay an additional $360,000" and that "the community estate at the time of separation in 2015 was simply too small." Br. of Appellant at 13-14. But this is immaterial at this juncture. The fact is that these parties, while represented by counsel, settled the merits of their dissolution. The interpretation of that agreement is all that is before us. We have concluded that the interpretation the trial court adopted is reasonable. We need not consider the underlying factual disputes.

Even so, Michael's position as to the paucity of community assets is hardly undisputed. In fact, Brenda argued that the community assets were much greater than Michael let on during settlement negotiations. To address the core of Michael's argument, certainly if there were no community assets, $360,000 could be considered "absurd." But that position was not established conclusively at any point because the parties settled their dispute. In light of Brenda's position that there were abundant community assets, a $360,000 property equalization obligation is not absurd.

Furthermore, considering the numerical figures based on Michael's interpretation would render the settlement agreement internally inconsistent. If we read the $360,000 figure to be a cap on maintenance, and payable over three years, rather than a community property equalization obligation, this would directly conflict with paragraph 1's requirement that maintenance payments be in the amount of $6,000. And $6,000 per month, for three years, is only $216,000, not $360,000. So, the paragraph 2 obligation must be something other than maintenance.

As Brenda points out:

> Under Michael's interpretation, he would be required to make $6,000 monthly payments until he had paid a total of $120,000, which would take 20 months. Then his payments would be $4,000 per month until he paid another $120,000, which would take 30 more months. Finally, he would pay $2,000 per month until he paid the last $120,000, which would take 60 more months. Under this schedule, it would take Michael 110 months—over nine years—to pay off the $360,000 obligation that Paragraph 2 says must be paid within three years, not nine.

Br. of Resp't at 56. Brenda's reasoning is persuasive. Michael's argument fails.

In arguing that the trial court's interpretation yields absurd results, Michael asserts that under the trial court's reading, he could be required to pay $6,000 per month for the remainder of his life, and then upon his death, his estate would still be liable for the final $360,000 community property terminating payment. Further, Michael asserts that under this interpretation there is no mechanism to adjust maintenance in the event Michael is disabled, retired, aged, or otherwise suffers reduced income. However, this is not the case: this "absurd result" would arise only if Michael breached the agreement by not meeting his payment obligations, including the $360,000 community property equalization obligation. Under the trial court's interpretation, which we find reasonable, Michael's maintenance obligations would terminate as long as he makes the required payments within the three year time frame stipulated in the agreement. Indeed, the planned three annual payments, and corresponding reduction in monthly maintenance amount, incentivizes Michael's compliance with the settlement he agreed to. Rather than absurdly requiring Michael to pay maintenance for the rest of his life (or even for 110 months) the agreement anticipates bringing the property equalization process to a close within three years. Again, Michael's argument fails.

Finally, Michael argues that the trial court should have considered context evidence when interpreting the settlement agreement, specifically when the court, at the CR 60(b) hearing,

interpreted what Commissioner Gelman hand wrote into the underlying order interpreting the disputed language (set out above). Michael offers an explanation as to why the court did not consider this: it was provided the wrong Gelman Order with the proposed language and not the final language. Michael alleges that "[the court] was given the Court Order that Brenda Kuehner *wished* had been signed." Br. of Appellant' at 19. As stated previously, Michael offers no evidence to support this contention.

For the aforementioned reasons, we affirm the trial court's order denying Michael's CR 60(b)(4) motion to vacate, which adopts Brenda's interpretation of the four disputed paragraphs in the settlement agreement.

## ATTORNEY FEES ON APPEAL

Brenda requests attorney fees "as a sanction for Michael's intransigence in needlessly increasing the cost of litigation by rearguing alleged errors that he already waived, either by inviting them or simply failing to raise them in the trial court." Br. of Respondent at 58. In the alternative, Brenda asserts that we should award fees under RAP 18.9 for a frivolous appeal.

RAP 18.9(a) provides that we may order a party who files a frivolous appeal to pay damages to a party who has been harmed. "An appeal is frivolous when the appeal presents no debatable issues on which reasonable minds could differ and is so lacking in merit that there is no possibility of reversal." *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012).

Here, Michael failed to adequately address fraud and instead relied on unadmitted evidence as the basis for his arguments on appeal. He also failed to cite to any authority for his arguments, but for two cases in one introductory paragraph, and those related to general propositions having to do with contract interpretation. His appeal is frivolous. Accordingly, we hold that Brenda is entitled to attorney fees under RAP 18.9.

CONCLUSION

We hold that the trial court did not err in denying Michael's CR 60(b)(4) motion. We also hold that the trial court correctly interpreted the settlement agreement and affirm the trial court's orders. Finally, we award attorney fees to Brenda under RAP 18.9(a).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Lee, P.J.

Che, J.